**JAMES STEWART CORPORATION v.
UNITED STATES.**

No. 45051.

Court of Claims.
May 5, 1947.

Huston Thompson, of Washington, D. C., for plaintiff.

Frank J. Keating, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff made a contract with the United States in 1934 to construct Lock 12 in the Mississippi River at Bellevue, Iowa, which is 23 miles downstream from Dubuque, and 85 miles above Rock Island. There was much delay in the completion of the contract and the plaintiff lost a large sum of money on it. A number of similar projects on the Mississippi and its tributaries were carried out at about the same time, as PWA projects, with the dual purpose of building useful facilities for the

Government, and alleviating the depression by giving employment to labor and stimulation to business.

In 1937 the plaintiff and other contractors obtained the enactment by Congress of the special jurisdictional act which is quoted in finding 1. The theory of the plaintiff's suit is that the agents of the Government who acted for it in regard to this contract, imposed upon the plaintiff to its damage, requirements not sanctioned by the contract, and refused to give the plaintiff privileges to which it was entitled under the contract. The plaintiff relies heavily upon the provision in the statute relating to the alleged failure of the Government to supply qualified labor, and asserts that there was such a failure in this case, and that it caused the plaintiff much loss.

The contract provided, as was natural, considering the purpose of the Government in having this work done at the time it was done, that the plaintiff should obtain its labor, other than supervisory employees, through the United States Employment Service office in the area of the project, or through local union offices there. The plaintiff elected to make the job a non-union job, so resorted only to the Employment Service office. The contract required that the work should be given first to residents of the counties in Iowa and Illinois adjacent to the project; if that supply of labor was insufficient, then to residents of the states of Iowa and Illinois.

An official of the plaintiff visited the area before bidding on the job. He knew that it was a rural area, with no large cities near. He was told by the representative of the United States that there would be plenty of qualified laborers and mechanics available for the work; that, however, the experience of the available carpenters would have been only in the construction of houses and barns since there had been no heavy construction such as that of large buildings or dams in the area; that if a shortage of carpenters developed, they would go to other areas to obtain them. The plaintiff's official was told that the assurance that carpenters were available was based upon a survey which had recently been made. In fact, this "survey" was only a registration of the unemployed, in response to public notices given that work was in prospect on the Lock 12 project. In the registration, the registrant stated his qualifications, but no examination or other check was made to determine the truth of his statements.

When the work was started, and carpenters were called for, the United States Employment Service promptly caused men registered as carpenters to report to the job. The carpenter work, which was a substantial part of the job, consisted largely of the construction, setting, and removal of wooden forms for the placement of concrete. The forms consisted in the main of large board panels, built on the floor in a carpenter shop, and then moved by machinery to the place where the concrete was to be poured. The men who reported for work as carpenters were mostly inexperienced in the building and setting of such forms. This, it seems to us, was just what the plaintiff should have and must have expected, and hence was no breach of the contract to supply qualified labor. One main purpose of the project was to give employment to local labor, and the text of the contract was specific on this point. To argue, as does the plaintiff, that the carpentry of form building is such a special trade that an experienced house carpenter is not qualified, within the meaning of the contract, to perform it, is to argue that practically all of the work set up and paid for by the Government for the relief of local unemployed men could be denied by the plaintiff to the very men for whom it was created. If the plaintiff thought that such a frustrating interpretation should be given to the contract, it should, in all fairness, have said so before the contract was made. It knew the relevant facts then as well as it knows them now.

We think that, in view of the purpose of these PWA projects, and of the facts known to the parties at the time the contract was signed, the words "labor * * * qualified to perform the work to which the employment relates," mean, with regard to carpenters, persons skilled in the use of carpenter's tools, and competent to do the carpenter work available in the locality. The plaintiff should have contemplated

that, in breaking these men into this work, more supervision would be required than in working a gang of experienced form carpenters. Hence, we think that the lack of experience in building and setting forms for the construction of a lock, and whatever additional expense for supervision may have resulted therefrom, gives no right of action.

█ A considerable number of persons registered with the employment service as carpenters who were not carpenters. The wages specified for carpenters, $1.20 per hour as compared with fifty cents per hour for common labor, was a temptation to such misrepresentation. We suppose that the plaintiff no more expected of the United States Employment Service that it would test a registrant in his asserted trade, or cross-examine him as to the truth of his statements on the registration form, than would a private employment service. The plaintiff was given a completely free hand as to hiring or retaining workmen who were referred to it. However, as the situation developed, the persistent referral by the Employment Service of a considerable number of persons who were not carpenters put the plaintiff in a position where it was more economical to keep and train the more promising of these workmen than to discharge them and receive for their replacement, about the same proportion of persons no more skilled than they were. In the circumstances, we think that there was a degree of failure on the part of the Government to furnish an adequate supply of qualified labor, and that the plaintiff should have been given the privilege of trying to make up the deficiency by hiring carpenters from sources other than the United States Employment Service. The question of measuring the damage done to the plaintiff by this denial of its rights is difficult, and is discussed hereinafter.

█ The plaintiff urges that the work which the carpenters did was seriously defective, which proved their incompetence. The principal instances are (1) that their setting of the forms frequently required additional work after the Government inspectors had inspected and rejected them

as not being true to line; (2) that when the forms were, upon occasion, forced out of position when concrete was poured into them, the carpenters were slow in bringing them back into position. We should have supposed that the plaintiff's foremen, hired by it without any restriction as to where they came from, would not have permitted a form to be reported as ready for inspection until they had examined it and could certify it as plumb and straight, and as containing whatever special departures from the normal the drawings called for. We do not understand why the forms could not have been, with adequate supervision, set so that they would pass inspection. While we think that the plaintiff's being obliged to take some men and make carpenters of them no doubt diminished the efficiency of the force as a whole, we think that a good deal of the trouble about defective forms must have been due to the plaintiff's foremen.

As to the bringing of forms back into line when the fresh concrete had distorted them, that problem was bedeviled by the trouble that the plaintiff had with its "pumpcrete" method of distributing concrete from the mixer to the distant form through pipes. The tendency of the pipes to clog, with serious consequences, whenever the flow was stopped for any reason, meant that any delay at all at the point of delivery might cause a serious ultimate delay. So far as we are advised, it is not unusual for forms, no matter how competently set, to be occasionally distorted by the heavy mass of fresh concrete. We think that the delays resulting from these distortions were due to the problem of the pumpcrete machine much more than to any incompetence of the carpenters in, we suppose under the direction of a foreman, tightening or loosening a nut here or inserting a brace or strut in another place.

█ The plaintiff complains that the Government promulgated a rule that not more than one carpenter's helper could be worked with one carpenter. So far as the evidence shows, this rule had no effect whatever upon the plaintiff's hiring practices or its costs. Before the rule was issued, the plaintiff's force was in the pro-

portion of 1.6 carpenters to each helper, and it continued that way thereafter.

The plaintiff complains that, although it had had serious and costly difficulty with its "pumpcrete" equipment for delivering concrete from the mixer to the forms, the Government refused for several months to permit it to make its mixture flow more easily by adding cement and water.

As shown in finding 39, the specifications of the contract called for a minimum cement content of 4.5 bags for each cubic yard of concrete, and a maximum water content of 6.5 gallons per bag of cement. They also provided that the exact proportions of all materials entering the concrete should be as directed by the contracting officer. For the first several months of concrete pouring, the specified minimum of 4.5 bags of cement was used, together with the maximum amount of water. The mixture frequently clogged the pumpcrete lines, as we have said. The plaintiff called for an expert from the manufacturer of the pumpcrete equipment, who, after observing the operation, decided that the equipment would not function properly with so dry a mix. The only way to get more water into the mix was to put more cement into it. The plaintiff requested permission to add cement at its own expense. The Government expert at the laboratory at Rock Island at first refused to allow the addition of cement, on the ground that it would generate too much heat in the setting up of the cement. Later, the plaintiff's difficulty with the pumpcrete system persisting, the plaintiff was allowed to use 4.6 bags of cement per yard, with a proportionate increase of water. This did not solve the problem, and finally, about October 20, 1945, the Government permitted the use of 4.75 bags of cement per yard. The additional water thus permitted caused the concrete to pass satisfactorily through the pumpcrete system.

■ We do not think that the Government's refusal to give earlier permission to increase the cement and water content has been shown to be a breach of contract. There was no reason, except to accommodate the plaintiff in regard to the type of distributing system which it had chosen, to change the mix, and the Government thought that, because of the tendency of the richer mixture to heat, the quality of the concrete would be damaged. In those circumstances, caution was quite proper. The plaintiff was allowed to try a slightly richer mixture, and, that not being sufficient, was allowed to try the mixture which turned out to be satisfactory. The evidence does not tell us when the plaintiff requested permission to add more cement, or when and how often the request was repeated. We do not find in these facts such a lack of consideration of the plaintiff's interests by the Government as to amount to a breach of the implied obligation of the contract to give fair consideration to those interests.

■ In the course of the work the plaintiff adopted a number of courses of conduct which turned out to be harmful to the early and economical performance of the job. Its method of constructing the main cofferdam proved inadequate and it was obliged to add a steel cell, with a resulting serious delay in securing materials and getting the pouring of concrete in the main lock under way. Due to careless supervision, it failed to construct the 400 foot long crib for the upper guide wall according to the specifications, and ultimately lost the value of this structure. We have already adverted to its choice of the pumpcrete method of distributing concrete. It chose not to pour the concrete in the lower guide wall during the months of low water in the autumn of 1934, and was then prevented from doing so by several months of high water. This not only delayed the completion of the job for several months, but at last required the construction of a cofferdam for that wall, which work, according to the contract, did not entitle the plaintiff to any compensation. These unfortunate experiences were, without doubt, the principal cause of the plaintiff's losses.

■ We have said that we think the Government breached its contract in not furnishing the plaintiff an adequate supply of qualified carpenters and at the same time denying the plaintiff permission to hire carpenters outside the employment service.

While the evidence is not, and probably could not be very definite as to the financial consequences of the reduced efficiency of the plaintiff's staff resulting from the breach, we have concluded, as shown in our finding 72 that the direct labor costs were increased by $25,000, the costs for form lumber by $4,500, and that the completion of the work was delayed by ten days with increases in equipment rental and overhead costs attributable to that period, amounting to $4,271.40.

The plaintiff is entitled to a judgment for $33,771.40.

It is so ordered.

JONES, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.